Argued October 26, 1955, reversed March 7, 1956

## MALLATT *v.* LUIHN ET AL
294 P. 2d 871

*John W. Brugman,* special assistant to the Attorney General, Portland, argued the cause for appellants.

With him on the briefs were Robert Y. Thornton, Attorney General, Salem, and Bardi G. Skulason, Portland, in pro. per.

*Thomas R. Mahoney,* Portland, argued the cause and filed a brief for respondent.

LUSK, J.

The plaintiff brought this suit under the declaratory judgment statute to have determined questions of the construction and validity of Oregon Laws 1949, ch 590, and Oregon Laws 1953, ch 361 (hereinafter referred to, respectively, as the 1949 Act and the 1953 Act), imposing liability to "needy persons" as defined in ORS 413.010(5) upon certain relatives of such needy persons and to obtain a declaration of rights under such legislation. The defendants are the members of the State Public Welfare Commission (hereinafter called the Commission) and the administrator of the Commission, which is charged with supervision of the administration of these laws by the county public welfare commissions. The court below entered a decree declaring both the 1949 and 1953 acts unconstitutional and void, and the defendants have appealed.

It appears from the pleadings that plaintiff is the daughter of Lettie Dellorah Courter and Albert Dorsey Courter, who have been receiving old age assistance from the state of Oregon pursuant to the provisions of Oregon Laws 1951, ch 309, now ORS 413.010 et seq., since January 1, 1952, up to the time of filing the complaint, which was October 14, 1953. There are seven other children, brothers and sisters of the plaintiff, residing in Oregon, all of whom, according to the complaint, have incomes equal to or exceeding that of the plaintiff.

On September 9, 1953, the Commission notified the plaintiff by registered mail that it had paid to her parents during the calendar year 1952 the sum of $1242, under the provisions of the 1949 Act, and demanded payment by plaintiff of $180, and further notified the plaintiff that under the provisions of the 1953 Act she would be required to pay the sum of $70 per month, on account of money paid to her parents by the Commission, if her income during 1953 equalled her income for the year 1952.

Upon various grounds the plaintiff contends by her complaint that the two statutes in question, which, taken together, are known as the ''Relatives' Support Act,'' are unconstitutional. It will serve the purpose of clarity first to summarize the pertinent provisions of the statutes involved.

By ORS 413.010 (5) a needy person is defined as ''a person who has attained the age of 65 years and who does not have income and resources sufficient to provide himself with food, clothing, shelter and such other essential needs as are necessary to afford a reasonable sustenance necessary to maintain life and compatible with decency and health.'' Under this section and ORS 413.020 and 413.040 (2), a needy person, as thus defined, who meets certain residence requirements, is entitled to old age assistance in an amount which added to income is sufficient to equal at least $50 per month.

The laws whose meaning and validity are drawn in question by this proceeding were passed for the purpose of imposing liability on certain responsible relatives of needy persons for the amounts of old age assistance furnished them and to prescribe procedures for the enforcement of such liability.

The existing law is codified as ORS 411.410-411.470.

The statutes now in question are as follows:

*The 1949 Act*

Each county public welfare commission, upon receipt of an application for public assistance, is required to investigate the facts relating to the income and financial condition of the applicant's living husband, wife, father, mother, son or daughter, or any or all of them (§ 1). Statements under oath from the applicant and relatives may be required (id.). A report containing the result of such investigation must be made to the Commission (id.). The Commission, upon receipt of such report, may make such further investigation as it deems necessary and shall make a determination of the liability of each living relative for contribution to the applicant's support in accordance with 'the relatives' contribution scale" (§ 2). "In determining the ability to contribute, the financial circumstances of such relatives shall be given due consideration and in unusual cases a contribution of less than the amount fixed in the relatives' contribution scale may be made as the Commission may deem justifiable" (id.). Relatives are made liable to each needy person for monthly amounts determined in accordance with the "relatives' contribution scale," which is set forth (§ 3). The amounts are fixed in an ascending scale with reference to the net monthly income of responsible relatives as determined by their state income tax returns, but such amounts are diminished progressively in accordance with the number of persons dependent upon the income (id.). To illustrate, a relative having a net monthly income in the bracket $395 to $474, upon which one person is dependent, is made liable to pay $70 per month. If there are two dependents the amount of his liability is $50; if three, $40; if four, $35; if five, $25; if six, $20; if seven, $10 (id.).

It is provided that by accepting public assistance the recipient thereof shall be deemed to consent to the recovery of an amount equal thereto from any responsible living relative or relatives by the Commission (§ 4), and the needy person is given a cause of action against the relative for the monthly contributions established by the relatives' contribution scale and may recover a judgment for all accumulated contributions for which the defendant is liable under the act (§ 5). The Commission is subrogated to the right of the needy person to prosecute such an action (§ 6), and is authorized either in its own name or in the name of the needy person to maintain legal proceedings for the amount of the relatives' contribution established by the act (§ 7).

*The 1953 Act*

The 1953 Act retains the essential features of the 1949 Act, but provides a scale of monthly payments required to be made by relatives based on their gross annual income—defined as "gross income plus dependency credits and federal income tax deductions of the relative, as determined by the state income tax return filed during the current year" (§ 3)—and incorporates an alternative method of enforcing the liability of relatives by authorizing the Commission to issue warrants to county sheriffs to levy upon the property of delinquent relatives. As a prerequisite to the exercise of this power the Commission is required, after having made a determination of liability pursuant to the 1949 Act, to hold a hearing. Notice must be given to the relative affected that "a contribution pursuant to the scale provided in section 3 of this Act is due and payable to the Commission for aid given to the needy person and that the relative may appear

for a hearing on objections to his financial responsibility" at a time and place specified (§ 4). If the evidence at the hearing, or, in case of the relative's failure to appear at the hearing, the evidence developed at the previous investigation does not disclose sufficient reason why the relative should not be held responsible, the Commission must notify the relative of its final decision within ten days after making it (§ 6). Within 30 days after the mailing of such notice the relative may appeal to the circuit court, the appeal to proceed as a suit in equity in which the Commission is the defendant (§ 7). Either party may appeal from the decision of the circuit court to the Supreme Court (id.). We quote §§ 8 and 9 in full:

"Section 8. If the relative fails to appeal a final decision of the commission within the time specified in section 7 of this Act or if the court, on appeal, decides in favor of the commission, the State Public Welfare Commission may issue a warrant under its hand and directed to the sheriff of any county of the state commanding him to levy upon and sell the real and personal property of the relative found within his county, for the payment of the amount of the contribution and the cost of executing the warrant, and to return such warrant to the commission and pay to it the money collected by virtue thereof by a time to be therein specified, not less than 60 days from the date of the warrant. The sheriff shall, not later than five days after the receipt of the warrant, file with the clerk of his county a copy thereof. Thereupon, the clerk shall enter in the judgment docket, in the column for judgment debtors, the name of the relative mentioned in the warrant, and in appropriate columns the amount of the contribution due or portion thereof for which the warrant is issued and the date when such copy is filed.

"Section 9. (1) The amount of a warrant dock-

eted under section 8 of this Act shall become a lien upon the title to and interest in real property or personal property of the relative against whom it is issued in the same manner as a judgment duly docketed in the office of the county clerk. The sheriff shall then proceed upon the warrant in all respects, with like effect and in the same manner provided by law in respect to executions issued against property upon judgment of a court of record, and shall be entitled to the same fees for his services in executing the warrant, to be added to and collected as a part of the warrant liability.

"(2) If a warrant is returned not satisfied in full, the commission shall have the same remedies to enforce the claim for contributions against the relative as if the people of the state had recovered judgment against the relative for the amount of the contribution."

It is contended by the plaintiff that the provisions for enforcement of liability of a responsible relative do not meet the requirements of due process, because liability in an amount fixed by the statute is imposed without notice to the relative and an opportunity to be heard on the questions whether the determination of the Commission that the applicant for public assistance is a needy person is warranted, and whether the relative is financially able to pay.

It should first be observed that the Relatives' Support Act, as we construe it, does not ignore the element of ability to pay. We should have grave doubt about its constitutionality were that the case. Statutes imposing on relatives liability for the support of poor persons usually require that the relative be of sufficient ability to provide support. 70 CJS 103, Paupers § 60 b. This is true of ORS 167.605, making it a criminal offense for a man to fail to support his wife or minor children "without just or sufficient cause,"

and of ORS 167.635, imposing penalties upon any person over the age of 21 years, who, "having the ability so to do, fails and neglects to support his or her indigent parent." The former statute was held constitutional in *State v. Bailey,* 115 Or 428, 236 P 1053. The latter was construed in *State v. Francis,* 126 Or 253, 269 P 878. So, also, ORS 428.010, which imposes upon certain relatives of an insane or feeble-minded person committed to a state institution the obligation to reimburse the state for the expense of maintaining such person in the institution, applies only to such relatives as are "possessed of an estate or income sufficient" to meet such expense. In sustaining this statute in the case of *In re Idleman's Commitment,* 146 Or 13, 27 P2d 305, this court cited with approval *The People v. Hill,* 163 Ill 186, 46 NE 796, 36 LRA 634, where the court traced the origin of modern support statutes to a moral and imperfect duty that the common law did not recognize, but which was transformed into a legal obligation by the statute of 43 Eliz., ch 2, § 7. See *Multnomah County v. Faling,* 49 Or 603, 91 P 21. One question in *The People v. Hill* was whether the legislature had the power to extend the obligation of support to brothers and sisters, and the Illinois court, in holding that the legislature had such power, said:

"* * * It can hardly be said that there is no moral duty whatever imposed upon a person who has sufficient financial ability, consistently with his duty to himself and to others, to supply the necessaries of life to a brother or sister who is unable to earn a livelihood in consequence of a bodily infirmity, idiocy, lunacy or other unavoidable cause, in cases where such brother or sister did not become a pauper from intemperance or other bad conduct." 163 Ill 190-191.

In *San Bernardino County v. McCall,* 56 Cal App2d 99, 132 P2d 65, the court passed upon the question of the defendant's ability to contribute to the support of his parents in an action brought by the county for reimbursement of aid furnished by it to the parents pursuant to the Old Age Assistance Act of California. That state has a statute imposing liability on responsible relatives similar to ours. Referring to the "relatives' contribution scale" in the California law (Deering's Welfare and Institutions Code § 2181), the court said:

> "\* \* \* The scale in question is set up for the guidance of boards of supervisors in fixing the liability of responsible relatives. In any event, this scale could not fix a liability for any amount named therein, without regard to his ability to pay."

See, also, *Cherokee County v. Smith,* 219 Ia 490, 495-496, 258 NW 182.

It will have been noticed that the statute requires the Commission in determining the ability of a relative to contribute to the needy persons' support to give due consideration to the financial circumstances of the relative and "in unusual cases a contribution less than the amount fixed in the relatives' contribution scale may be made as the Commission may deem justifiable." 1949 Act, § 2.

The "financial circumstances" of the relative certainty mean something more than his "net monthly income" or his "gross annual income" as disclosed by a state income tax return. While the draftsman of this legislation might well have used more precise and definite language in this and other parts of the act, still the failure in this regard does not relieve the court of its duty to ascertain the legislative intent, if

possible, and to give it effect. We are bound to assume that the legislature did have a purpose in including this provision in the statute, and we think that purpose was to measure, or, rather, to direct the Commission to measure the liability of the relative by his ability to pay. The basic premise of the statute is that in the usual case the amounts fixed in the scale will conform to that purpose, but there may be cases, as *San Bernardino County v. McCall* illustrates, in which, owing to the special circumstances of the individual, he cannot be compelled to contribute the entire, or, perhaps, any portion, of the amount fixed in the scale without depriving him of the means to provide for his own reasonable necessities. It is in such "unusual cases" that the Commission, in the exercise of a sound discretion, is authorized to determine the responsible relative's liability in an amount less than the amount fixed by the scale. And in no action brought by the Commission under its right of subrogation is recovery authorized in any greater amount, regardless of the fact that assistance to the full extent provided in the scale may have been given by the Commission to the needy person.

This being in our judgment the proper construction of the act, we will now consider whether the enforcement of plaintiff's liability in an action at law without a previous administrative hearing is a deprivation of property without due process of law in contravention of the Fourteenth Amendment.

■ While notice and an opportunity to be heard are of the essence of due process, it is not required that a hearing shall be given at any particular stage of the proceedings. It is sufficient if, before liability becomes final, the person whose rights are affected is given his "day in court." *Stettler v. O'Hara,* 69 Or 519, 540,

139 P 743, LRA 1917C 944, Ann Cas 1916A 217; *Towns v. Klamath County,* 33 Or 225, 233, 234, 53 P 604.

"* * * Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." *Ewing v. Mytinger & Casselberry,* 339 US 594, 599, 94 L ed 1088, 70 S Ct 87.

See, also, *Phillips v. Comissioner of Internal Revenue,* 283 US 589, 596, 75 L ed 1289, 51 S Ct 608; Davis on Administrative Law 267, § 75.

We applied this principle in *State v. Schriber,* 185 Or 615, 639-640, 205 P2d 149, where we held, in harmony with many decisions (of which *Ewing v. Mytinger & Casselberry* is one), that a law authorizing summary destruction of cattle infected with Bang's disease was not unconstitutional notwithstanding no provision was made for either an administrative or a judicial hearing, since the law implied the right of the owner of cattle thus destroyed to sue the administrative officer for damages and in that way to have determined whether the action taken was wrongful and, if it was, to secure redress.

■ In like manner, where liability based on an administrative determination is sought to be enforced by court action, as may be done under the challenged statute, the defendant is not concluded by such determination but may resist on the merits. It was so held in *Salem v. Eastern R. Co.,* 98 Mass 431, 96 Am Dec 650, which was relied on as authority by the Supreme Court of the United States in *North American Cold Storage Co. v. Chicago,* 211 US 306, 53 L ed 195,

29 S Ct 101, 15 Ann Cas 276. As summarized in the opinion in the latter case the Massachusetts case

"was an action brought to recover moneys spent by the city to drain certain dams and ponds declared by the board of health to be a nuisance. The court held that, in a suit to recover such expenses incurred in removing a nuisance, when prosecuted against a party on the ground that he caused the same, but who was not heard, and had no opportunity to be heard upon the questions before the board of health, such party is not concluded in the findings or adjudications of that board, and many contest all the facts upon which his liability is sought to be established." 211 US at p 200.

In the North American Cold Storage Co. case the court dealt with the summary destruction by health officers of unwholesome food which is unfit for human consumption. It was held that there was no violation of due process because there was a right in the owner of the property to recover judgment against the officers if the food was not in fact unwholesome so as not to be fit for human consumption. The Massachusetts case was cited as involving an application of the same principle. In that case the court said:

"But the court are of opinion that, in a suit to recover expenses incurred in removing a nuisance, when prosecuted against a party on the ground that he caused the same, but who was not heard, and had no opportunity to be heard, upon the questions before the board of health, such party is not concluded by the findings or adjudications of that board, and may contest all the facts upon which his liability is sought to be established. He is neither party nor privy to those adjudications; he has no right of appeal, and no other means by which to revise the proceedings or to correct errors, either of law or fact, therein." 98 Mass at p 447.

██ In the enactment of the legislation with which this case is concerned the legislature may well have considered, as it was within its province to do, that to require administrative hearings upon the question of relatives' liability in all cases would unduly interfere with the proper and efficient administration of the old age assistance law. When, however, it amended the original Relatives' Support Act in 1953 and adopted new provisions it deemed it expedient to provide an additional enforcement procedure to be employed "in lieu of bringing an action at law on a theory of subrogation" (§ 4). The Commission was authorized, after notice to the responsible relative and a hearing "on objections to his financial responsibility," and after a decision favorable to the Commission in the courts, in the event of an appeal by the relative pursuant to § 7, to issue a warrant to the sheriff of any county which would eventuate in the creation of a lien upon the relative's property and the enforcement of such lien by a procedure similar to the levying of execution and judicial sale of the delinquent relative's property on a docketed judgment. In view of the use of the term "responsible relatives" in the statute, as indicating those relatives who are liable to contribute to a needy person's support, it is reasonably clear that the hearing on objections to the "financial responsibility" of the relative comprehends his right to contest before the Commission and later in the courts the claim of liability against him on any available ground. And, as the issues of fact involved in such a proceeding are not such as were triable by a jury at the time of the adoption of the Constitution, there is no violation of the right to trial by jury in the provision that the appeal to the circuit court shall proceed as a suit in

equity. *In re Idleman's Commitment,* supra, 146 Or at p 28.

Thus, this procedure for the enforcement of the Commission's claim adequately complies with the requirement of due process. No warrant can issue and no lien can be created until the relative against whom liability is asserted has had ample notice of a hearing before the Commission and an opportunity to be heard. If he waives his right to be heard the warrant may issue. If he appears and the decision is against him he may appeal to the circuit court and again to the Supreme Court. In any case his property cannot be sold until after notice has been duly given by publication as provided in the statutes which govern the execution of judgments. ORS 23.450.

The plaintiff objects that the warrant procedure is invalid because under the statute a lien may only be foreclosed by a suit in equity, citing ORS 88.010; *State v. Swensk,* 161 Or 281, 89 P2d 587; and *Cordrey v. Steamship "Bee,"* 102 Or 636, 201 P 202. These cases involve statutes which created liens but which did not provide for a different method of foreclosure than the general method prescribed by ORS 88.010. In the present statute the legislature has prescribed a different method for enforcing the lien, i.e., "in the same manner provided by law in respect to executions issued against property upon judgment of a court of record." 1953 Act, § 9 (1). It cannot be successfully maintained that the legislature was without power to enact such a provision. The legislature is free to adopt such procedures as it may choose so long as they do not come in conflict with constitutional limitations. In the case of *Cordrey v. Steamship "Bee,"* upon which the plaintiff relies, Mr. Justice BURNETT, writing the opinion for the court, was at pains to demonstrate this

by citations to the decisions of the Supreme Court of
the United States, among others *Iowa Central Ry Co.
v. Iowa,* 160 US 389, 393, 40 L ed 467, 16 S Ct 344,
where it is said:

> "The fourteenth amendment in no way under-
> takes to control the power of a state to determine
> by what process legal rights may be asserted or
> legal obligations may be enforced, provided the
> method of procedure adopted for these purposes
> gives reasonable notice and affords fair oppor-
> tunity to be heard before the issues are decided."

See, also, *The Robert W. Parsons,* 191 US 17, 48 L ed
73, 24 S Ct 8; *Brown v. New Jersey,* 175 US 172, 175,
44 L ed 119, 20 S Ct 77; *Ex parte Reggel,* 114 US 642,
651, 29 L ed 250, 5 S Ct 1148; *Missouri v. Lewis,* 101
US 22, 31, 25 L ed 989.

▉ It is our opinion that there is no violation of due
process in either of the enforcement procedures pro-
vided by the statute. Whether the one or the other is
employed, the responsible relative will have ample op-
portunity to defend on the ground that the alleged
needy person is not so in fact, or that the relative is
financially unable to make the contribution in accord-
ance with the determination of the Commission.

▉ The plaintiff contends that the warrant pro-
cedure confers judicial power on the Commission in
violation of Art III, § 1, Constitution of Oregon. An-
swering this contention, counsel for the Commission say
that the function of the Commission is "purely min-
isterial," and they continue:

> "The action of the Commission in the premises
> does not require a judicial determination, for the
> law itself fixes the contribution scale and limits its
> application to the income of the relative as deter-
> mined by the State income tax return filed during

the current year, or in certain cases, the return filed for a preceding year. Thus the Commission cannot use its own judgment in the matter, because the law declares what the judgment shall be.''

We cannot accept this construction. As we have already indicated, the Commission, at a hearing which must be accorded the relative before a warrant can issue, acts as a fact-finding body and may be called upon to determine the questions of need of the person applying for old age assistance and the ability of the relative to pay. If the Commission's function were limited in the manner suggested there would be no point whatever in the provisions for a hearing and appeal to the courts. Such a construction, indeed, would probably compel a decision that this part of the act is unconstitutional, for in practical effect it would result in imposing liability without real opportunity for a hearing.

But the mere fact that some functions usually performed by courts are conferred upon an administrative body does not necessarily bring the legislation into conflict with the principle of the separation of powers. As this court said in *In re Willow Creek,* 74 Or 592, 611, 144 P 505, 146 P 475:

''Many executive officers, even those commonly known as purely administrative officers, act judicially in the performance of their official duties, and in so doing do not exercise judicial powers as the words are commonly used and as they are used in the organic act in conferring judicial powers upon specified tribunals.''

See, also, *Roles Shingle Co. v. Bergerson,* 142 Or 131, 134, 19 P2d 94; *Evanhoff v. S.I.A.C.,* 78 Or 503, 515, 154 P 106. Upon this subject Mr. Justice Douglas, speaking for the court in *Sunshine Anthracite Coal Co. v. Adkins,* 310 US 381, 84 L ed 1263, 60 S Ct 907, said:

"To hold that there was [an invalid delegation of judicial power] would be to turn back the clock on at least a half century of administrative law." There an administrative agency was empowered by Congress to determine whether a particular coal producer fell within the Bituminous Coal Act by determining whether it produced bituminous coal as defined in the act. More to the point is *Phillips v. Commissioner of Internal Revenue,* supra. By the Revenue Act of February 26, 1926, the Commissioner of Internal Revenue was authorized to assess against, and collect unpaid corporate taxes from a stockholder of a dissolved corporation who had received therefrom a distributive dividend. Eventual judicial review was available to the transferee. He could contest his liability by bringing his action either against the United States or the collector to recover the amount paid, or he could secure immediate redetermination of his liability by the board of tax appeals with a right of review by the United States Circuit Court of Appeals. The former remedy was available where the transferee did not appeal from the action of the commissioner and the latter made an assessment and enforced payment by distraint; or where the transferee voluntarily paid the tax and thereafter was denied administrative relief. The statute was held valid over objections that it offended against the separation of the powers and violated the guarantee of due process. The case stands for the proposition that imposition of income tax liability, through summary administrative proceedings, will be sustained as long as adequate judicial review at some stage of the proceedings is afforded. The court said, speaking through Mr. Justice Brandeis:

"* * * That Congress deemed the section necessary in order to make the tax-collecting system

more effective, is established not only by the fact of enactment but also by the reports of the committees.

"The right of the United States to collect its internal revenue by summary administrative proceedings has long been settled. Where, as here, adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained." 283 US 594-595.

For like reasons the state of Oregon has the right to collect its pecuniary obligations by summary proceedings when, as here, resort to the courts may be had to review the administrative determination. It should be noted that there is no provision giving special weight to the Commission's decisions, such as making its findings conclusive if supported by evidence. The appeal, where one is taken, is to be tried as a suit in equity. This, we think, means a trial *de novo,* not on a record already made but upon evidence to be introduced at such trial.

The plaintiff places her principal reliance upon *In re Opinion of the Justices,* 87 NH 492, 179 A 344, 110 ALR 819. This was an advisory opinion holding unconstitutional a proposed bill which would set up a commission with authority to determine liability upon claims arising out of motor vehicle accidents and to order compensation to be paid out of a fund held by the state treasurer. The basis of the ruling is that the commission was empowered to determine rights as between private litigants. The court recognized that "in the connection between the departments some overlapping is permissible," but said:

"* * * As a rule which meets most situations, when an executive board has regulatory functions,

it may hear and determine controversies which are incidental thereto, but if the duty is primarily to decide questions of legal right between private parties, the function belongs to the judiciary.''

The case is obviously not in point.

19, 20. The plaintiff contends on two grounds that the 1953 Act violates the equal protection clause of the Fourteenth Amendment to the Federal Constitution and Art I, § 20, of the Constitution of Oregon. It is asserted first that the statute arbitrarily fixes liability with reference to gross income as shown by the relatives' state income tax return, and could result in exempting some relatives of wealth but no income, thereby discriminating against those who file income tax returns. This same contention was urged in *Los Angeles County v. Hurlbut,* 44 Cal App2d 88, 111 P2d 963, and rejected upon the familiar ground that if there is a reasonable basis for classification, and all persons within the class are treated equally, there is no constitutional infirmity in the legislation. The court there held that the ''purpose behind the scheme of proceeding against those filing income tax returns was to abbreviate the labors of those investigating the pecuniary ability of the kindred of a recipient'' and that on the assumption ''that the legislative intent was to proceed only against those filing income tax returns, in view of its obvious purpose, this is a natural classification which the legislature, in the exercise of its discretion had the right to designate as the first element in the proof of financial ability.''

The Hurlbut case was approved and followed in *Kelley v. State Board of Social Welfare,* 86 Cal App2d 627, 186 P2d 429.

We agree with the reasoning of the California decisions.

 It is well established that the courts will not undertake to disturb a legislative classification unless the legislature could not have had any reasonable grounds for believing that there were valid public considerations for the distinction made. *Dominion Hotel, Inc. v. Arizona,* 249 US 265, 268, 63 L ed 597, 39 S Ct 273; *Savage v. Martin,* 161 Or 660, 693-694, 91 P2d 273. And, while it is possible, though highly improbable, that, as counsel suggests, a man worth a million dollars would have no income and therefore no liability under the statute, that fact would not render the statute invalid, for a classification having some reasonable basis does not offend against the Federal Constitution or the Constitution of this state merely because it is not made with mathematical nicety or because in practice it results in some inequality. *Savage v. Martin,* supra. As Mr. Justice Holmes said, "The Fourteenth Amendment is not a pedagogical requirement of the impracticable." *Dominion Hotel, Inc. v. Arizona,* supra.

 The second ground of objection under this head arises out of the stipulated fact that some of plaintiff's brothers and sisters had taxable incomes exceeding hers and that upon the basis of such incomes they were liable as responsible relatives under the statute. The plaintiff says that, in these circumstances, to single her out and compel her to bear the full burden of contributing to the support of her parents, is an unconstitutional discrimination.

We do not agree. The plaintiff, if she should be compelled to reimburse the state for old age assistance furnished by it to her parents, would have a right of contribution from her brothers and sisters, who are equally liable and equally able to pay. As stated in 41 Am Jur 689, Poor and Poor Laws § 12, "Under

statutes providing for the support of poor relatives, if there are two or more equally liable, and of sufficient ability, and the one supports while the other refuses, the one supporting may recover from the other refusing.''

*Manthey v. Schueler*, 126 Minn 87, 147 NW 824, arose under a statute which provided that any poor person unable to earn a livelihood shall be supported by his children, parents, brothers, sisters, grandchildren, or grandparents, and such relatives having sufficient ability shall be called on for such support in the order stated. If the relative charged with the support of such poor person should refuse to support him when directed by the board or council of the county, town, city or village, he was subject to a forfeiture, and the municipal body furnishing support could recover of such relative. The action was brought by the maternal grandfather for contribution against the paternal grandfather of four children. The former had supported three of the children and the defendant had supported one and had refused to aid in the support of the others. The plaintiff claimed that the support furnished by him exceeded in value that furnished by the defendant and that the burden should be borne in common. The plaintiff recovered a judgment which was affirmed on appeal. The court said:

''* * * The case presented is one where two persons, charged by statute in the same degree for the support of dependent children, have furnished support in unequal amounts. If either the plaintiff or the defendant had furnished support when directed by the town authorities, there would be no question of the liability of the other to contribute. We are of the opinion that it was not necessary that either await such direction, that is, await until the status of the children as paupers was fixed by the

town authorities, in order that he have the right of contribution. The burden was a common and equal one imposed by the statute and rightly assumed by either of the grandparents. Equality of burden results equitably in equality of payment and the one properly paying more than his proportion may recover at law by way of contribution.'' (126 Minn 89.)

The same rule is enunciated in *Wood v. Wheat*, 226 Ky 762, 766, 11 SW2d 916, in this language:

"The statute imposes upon the children coming within its purview the obligation to support parents that may be in the condition indicated by it, and this obligation may not be shifted to one of the children to the exclusion of those equally liable and equally able to perform it. It is a general rule of equity that a party who has discharged an obligation or duty resting upon several, and constituting a common burden or liability, may recover contribution from those to whose advantage the discharge of the obligation operated."

As stated in 13 Am Jur 6, Contribution § 3, "when any burden ought, from the relationship of the parties or in respect of property held by them, to be equally borne and each party is in aequali jure, contribution is due if one has been compelled to pay more than his share. The doctrine is founded not upon contract, but upon principles of equity, and assists in the fair and just division of losses, preventing unfairness and injustice."

■ The Commission is not, however, required to join in one action all the responsible relatives in order that their respective liabilities may be apportioned in a single proceeding. What the Supreme Court of the United States said in answer to a contention of that

kind in *Phillips v. Commissioner of Internal Revenue,*
supra, is applicable here:

> "* * * Whatever the petitioners' rights to
> contribution may be against other stockholders who
> have also received shares of the distributed assets,
> the Government is not required, in collecting its
> revenue, to marshal the assets of a dissolved corpo-
> ration so as to adjust the rights of the various stock-
> holders." (283 US 604.)

▮ A further criticism of the statute is based upon
the fact that the responsible relative may be proceeded
against without previous notice that the Commission
is proposing to extend old age assistance to the re-
cipient. We know of no principle of constitutional law
which would require such notice. A similar contention
in *People v. Hill,* supra, was rejected by the court.
See 70 CJS 113, Paupers § 61 a.

▮ The statute is attacked because it provides that
from any amount which the Commission collects from
relatives as a result of legal proceedings it shall "de-
duct the full amount previously paid as public assist-
ance * * * and the remainder thereof, after de-
ducting the costs of any proceeding shall be *delivered
to the recipient"* (italics added). 1949 Act, § 7; 1953
Act, § 14. It is said that this is an authorization to
the Commission to collect from a responsible relative
a greater sum than it had paid to a recipient, and
that this would be confiscation of the relative's prop-
erty.

Section 4 of the 1949 Act provides that by accept-
ing public assistance "the recipient thereof shall be
deemed to consent to the recovery of an amount equal
thereto from any responsible living relative or rela-
tives" by the Commission. Section 5 of the 1949 Act
gives to "each needy person" a cause of action against
the relative or relatives for the monthly contribution

established by § 3 of the act, and § 6 of the 1949 Act provides that the Commission "shall be subrogated to the right of each needy person who is a recipient of public assistance * * * to prosecute an action at law arising under the provisions of this act against any living relative of such recipient." Section 7 of the 1949 Act and § 14 of the 1953 Act authorize the Commission, under its right of subrogation to prosecute legal proceedings "for the amount of the relatives' required contribution established by this Act."

We construe these provisions to mean that, where the public assistance furnished to the needy person is adequate for his necessities, the Commission can recover no more from a responsible relative than the amount of the assistance so furnished. If, however, due, perhaps, to the condition of the public funds, the assistance furnished by the Commission is not sufficient to meet the necessities of the needy person, then the Commission may recover from the responsible relative not merely the amount of the assistance furnished, but the needed amount, not exceeding, however, the amount specified in the scale. We think that this was the contingency which the legislature had in mind in adopting the provision directing the Commission to deliver to the needy person any balance remaining after the Commission had reimbursed itself for assistance furnished and paid the costs of the legal proceedings. In this view the section is unobjectionable.

The plaintiff contends that the 1953 Act is void because it is so vague and indefinite that it cannot be enforced. We will consider the specific objections under this head in the order in which they appear in plaintiff's brief.

■ (1) It is said that § 1 of the 1953 Act purports to amend § 1 of the 1949 Act but in fact contains identical

language. This is true, but the validity of the statute is not thereby affected. We will point out later the eventual disposition of this section.

■ (2) Section 16 provides that the act is intended to be a remedy for the collection of contributions from responsible relatives in addition to or as an alternative for "the action provided in" the 1949 Act. Section 17 provides that any action brought pursuant to § 6 of the 1949 Act, before the effective date of the 1953 Act, shall be concluded on the basis of the scale provided in § 3 of the 1949 Act. Counsel asserts that these provisions refer to a direct action against a relative as provided by § 7 of the 1949 Act, yet that section was specifically amended by § 14 of the 1953 Act. In our opinion the reference in both §§ 16 and 17 is not to § 7 of the 1949 Act, but to § 6, which subrogates the Commission to the right of the needy person to prosecute an action against a relative of the recipients of old age assistance. Section 6 of the 1949 Act was not amended and is now ORS 411.438. The objection, therefore, is without foundation.

■ (3) Criticism is made of the use of the phrase "by which this section is amended" in § 14. This phrase is a form prescribed to be used in certain circumstances by the "Uniform System Governing Style, Form and Mechanics of Legislative Measures" approved by Senate Concurrent Resolution No. 2, which was adopted by the Forty-Seventh Legislative Assembly January 13, 1953. See Senate and House Journal 1953, pp 784 and 892. The text of this resolution is on file in the office of the secretary of state. The purpose of the use of the phrase in question is thus explained in paragraph 10 at p 12 of the resolution:

"It must always be kept in mind that the words 'this Act,' used *in an amended section,* mean the Act

by which the section was created, and not the amending Act. Therefore, if it is desired, *in an amended section,* to refer to a new section created by the same bill, the reference should not be to 'section 2 of this Act.' The reference should be to 'section 2 of the 1953 Act by which this section was amended.' Conversely, if it is desired, *in a new section,* to refer to a section amended by the same bill, the reference should not be to 'section 1 of this Act,' but to 'section 76-631, O.C.L.A.,' for example." (Italics added.)

Section 7 of the 1949 Act authorized legal proceedings by the Commission under its right of subrogation by action at law and directed the disposition of the moneys so collected. It also authorized the Commission to request the services of the attorney general in the prosecution of such proceedings. Section 14 of the 1953 Act reads:

"Section 7, chapter 590, Oregon Laws 1949, is amended to read as follows:

"Sec. 7. The State Public Welfare Commission shall be and it hereby is authorized, either in its own name or in the name of the recipient of public assistance to whose right of action it has been subrogated, to commence and prosecute to final conclusion such legal proceedings as may be deemed necessary for the amount of the relatives' required contribution established by this Act. From the amount collected as result of such legal proceedings or as a result of a warrant proceeding under sections 4 to 12 of the 1953 Act *by which this section is amended,* the State Public Welfare Commission shall deduct the full amount previously paid as public assistance under the laws of this state and the remainder thereof, after deducting the costs of any proceeding shall be delivered to the recipient. The amount of any previously paid public assistance recovered in any proceeding shall be distributed by

the State Public Welfare Commission to the United States Government, the county and to the State Public Assistance Fund, as their interests may appear. The State Public Welfare Commission hereby is authorized to request the legal services of the Attorney General in the prosecution of any action under this Act, or the 1953 Act *by which this section is amended.*" (Italics added.)

Inasmuch as the 1953 Act, in §§ 4-12 thereof, granted the additional remedy to the Commission of summary proceedings through the issuance of warrants, the obvious purpose of the amendment was to make applicable to such proceedings the provisions in § 7 of the 1949 Act for the distribution of moneys collected and for requesting the assistance of the attorney general. The phrase "by which this section is amended," it will be observed, was used twice in referring to the provisions of the 1953 Act pursuant to the prescribed form in the portion of the Senate Concurrent Resolution from which we have quoted. Despite the novelty of this formula, its use, in our opinion, in no way obscures or casts doubt upon the plain meaning of § 14.

■ (4) It is contended that the 1953 Act is incomplete because in § 19, which provides among other things that ORS 411.470 shall be amended to read as follows as of a certain date (to be later explained), the text of the amended section is omitted. ORS 411.470 is the original revision of § 7 of the 1949 Act. The amendment of this section enacted by § 19 of the 1953 Act was not printed in the session laws obviously under the authority granted to the secretary of state by Oregon Laws 1953, ch 435, to omit in the official printing of the session laws "sections of the enrolled Acts that amended sections of the Oregon Revised Statutes." The section in question, we have ascer-

tained, is included in the enrolled act, and it appears as ORS 411.470 in the present publication of those laws. This contention is wholly devoid of merit.

(5) The final objection, based on the ground of uncertainty, arises out of the problem created by the enactment of the Oregon Revised Statutes. By Oregon Laws 1953, ch 3, the legislature enacted the revision "as law of the State of Oregon" (§ 1) and repealed "all statute laws of Oregon of a general, public and permanent nature enacted prior to January 12, 1953," the date on which the legislative assembly convened (§ 2) (with an exception not now material). The act was approved by the governor January 26, 1953, but by its terms did not become effective until December 31, 1953. It was necessary, therefore, to devise a method for making certain that amendments and repeals of statutory law during the 1953 session should not be repealed on December 31, 1953, by the coming into effect of the Oregon Revised Statutes, which, as we have said, was a revision of the laws in effect prior to the convening of the 1953 session. The problem and its proposed solution are thus described in Senate Concurrent Resolution No. 2 at p 24:

"The major adjusting problem will arise with respect to 1953 Acts that *repeal* or *amend* an existing statute. In the case of a *repeal,* it will be necessary that the repeal be made by reference to the OCLA (or Session Act) number, in order that the repeal may take effect prior to the effective date of the revised statutes. However, the revised statutes will contain a section that corresponds to the repealed section, so it will be necessary also to provide for the repeal of such *corresponding section* of the revised statutes.

"In the case of an *amendment,* the adjusting problem will be substantially the same as in the

case of a repeal. It will be necessary for the amendment to be effective as an amendment of the old law prior to the effective date of the revised statutes, and as an amendment of the revised statutes after their effective date. Some complications will exist in the cases of amendments, and repeals, because in some instances an O.C.L.A. section will have been divided into several revised sections, or combined with one or more other O.C.L.A. sections in a revised section.

"The only solution that seems workable is to draft the 1953 bills in the form of amendments or repeals of the existing statutes and *then,* upon favorable action on the bill by the committee to which it is referred, attach, as an adjusting section or sections, the *corresponding* ORS section or sections, amended to incorporate the substantive changes in existing statutes. Bracketing and underscoring will not be used in 'adjusting sections.' "

With the foregoing in mind, we may now undertake to interpret the section of the statute under consideration. The 1953 Act contains one purported amendment (§ 1); one actual amendment (§ 14); and the repeal of a section of the 1949 Act (§ 2). All the remaining provisions are new legislation with which we are not now concerned. Section 19, the so-called "adjusting section," reads:

"Upon the taking effect of the Oregon Revised Statutes or this Act, whichever occurs later, sections 1 and 14 of this Act and ORS 411.430 shall stand repealed and ORS 411.470 shall be amended to read as follows:

" (Text of ORS amendments omitted as provided by Chapter 435 of this volume)."

As the Oregon Revised Statutes took effect later, to-wit, December 31, 1953, that was the date upon which

the provisions of the adjusting section would become effective. It was evidently considered advisable to repeal § 1 of the 1953 Act because it was not in fact an amendment of § 1 of the 1949 Act, but simply a repetition of it, and the substance of § 1 of the 1949 Act was incorporated in the newly enacted revision as ORS 411.410. Section 3 of the 1949 Act, the relatives' contribution scale, was ORS 411.430. As § 3 was repealed by the 1953 Act and a new scale adopted in its stead, it was necessary to repeal ORS 411.430, otherwise there would be two conflicting scales in the law after December 31, 1953. Finally, the substance of § 7 of the 1949 Act became ORS 411.470. In order to continue this section in effect as it was amended by § 14 of the 1953 Act, the amendment which appears in § 19 was enacted and its effective date deferred until December 31, 1953. The amendment is, in substance, the same as that contained in § 14 with the exception that it refers to legal proceedings "for the amount of the relatives' required contribution established by ORS 411.430," which, as stated, contained the relatives' contribution scale of the 1949 Act. But, in the edition of ORS next published and containing the laws passed at the 1953 session of the legislature, the reference has been changed to ORS 411.425, which prescribes the scale adopted in the 1953 Act, thereby harmonizing the section with the clear legislative intent.

 Our conclusion is that there is no vagueness, indefiniteness or uncertainty about this legislation; that the provisions of the 1949 Act as revised in ORS continued in effect until April 15, 1953, the date of approval by the governor of the 1953 Act, and that thereafter the provisions of the 1949 Act, which were not amended or repealed, together with the new and amending provisions found in the 1953 Act, were in full force

and effect and have so continued except as they may have been changed by subsequent amendments.

In our opinion the Relatives' Support Act is a valid, constitutional and enforceable law. The decree of the Circuit Court is reversed and a decree will be entered here conformable to this opinion. No costs or disbursements will be allowed.